UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ERICA DUERR and BETH DUERR,

                                Plaintiffs,

       vs.

STATE GARDEN, INC.,
a Massachusetts corporation,

                               Defendant.

**COMPLAINT
AND JURY DEMAND**

Case No.:

COMES NOW the plaintiffs Erica Duerr and Beth Duerr, who, by and through their attorneys of record, MARLER CLARK, LLP, PS and UNDERBERG & KESSLER LLP, allege upon information and belief as follows:

## PARTIES

1.1     The plaintiff Erica Duerr is a resident of North Tonawanda, New York. The plaintiff resides within the jurisdiction of this Court.

1.2     The plaintiff Beth Duerr is a resident of Sanborn, New York. The plaintiff resides within the jurisdiction of this Court.

1.3     The defendant State Garden, Inc. ("State Garden") is a corporation organized and existing under the laws of the State of Massachusetts, with its principal place of business, on information and belief, in the State of Massachusetts. Upon information and belief, the defendant is authorized to do, and in fact does, business in the State of New York.

## JURISDICTION AND VENUE

2.1     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds

1

$75,000.00, exclusive of costs, it is between citizens of different states, and because the defendant has certain minimum contacts with the State of New York such that maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

2.2 Venue in the United States District Court of the Western District of New York is proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the plaintiffs' claims and causes action occurred in this judicial district, and because the defendant was subject to personal jurisdiction in this judicial district at the time of the commencement of the action.

## GENERAL ALLEGATIONS

### Prior Outbreaks

3.1 *E. coli* O157:H7 outbreaks associated with lettuce or spinach, specifically the "pre-washed" and "ready-to-eat" varieties sold under various brand and trade names, are by no means a new phenomenon. Outlined below is a list of *E. coli* outbreaks involving contaminated lettuce or spinach:

| Date | Vehicle | Etiology | Confirmed Cases | State(s) |
|------|---------|----------|-----------------|----------|
| Aug. 1993 | Salad Bar | *E. coli* O157:H7 | 53 | WA |
| July 1995 | Lettuce (leafy green; red; Romaine) | *E. coli* O157:H7 | 70 | MT |
| Sept. 1995 | Lettuce (Romaine) | *E. coli* O157:H7 | 20 | ID |
| Sept. 1995 | Lettuce (Iceberg) | *E. coli* O157:H7 | 30 | ME |
| Oct. 1995 | Lettuce (Iceberg; unconfirmed) | *E. coli* O157:H7 | 11 | OH |
| May-June 1996 | Lettuce (Mesclun; red leaf) | *E. coli* O157:H7 | 61 | CT, IL, NY |
| May 1998 | Salad | *E. coli* O157:H7 | 2 | CA |
| Feb.-Mar. 1999 | Lettuce (Iceberg) | *E. coli* O157:H7 | 72 | NE |
| July-Aug. 2002 | Lettuce (Romaine) | *E. coli* O157:H7 | 29 | ID, WA |
| Oct.2003 -May 2004 | Lettuce (mixed salad) | *E. coli* O157:H7 | 57 | CA |

| April 2004 | Spinach | *E. coli* O157:H7 | 16 | CA |
|---|---|---|---|---|
| Sept. 2005 | Lettuce (Romaine) | *E. coli* O157:H7 | 32 | MN, OR, WI |
| Sept. 2006 | Spinach (baby) | *E. coli* O157:H7 and other serotypes | 204 | Nationwide |
| Nov./Dec. 2006 | Lettuce | *E. coli* O157:H7 | 71 | DE, NY, NJ, PA |
| Nov./Dec. 2006 | Lettuce | *E. coli* O157:H7 | 81 | IA, MN, WI |
| May 2008 | Lettuce (Romaine) | *E. coli* O157:H7 | 9 | WA |
| April 2010 | Lettuce (Romaine) | *E. coli* O145 | 33 | MI, NY, OH, PA, TN |
| March 2011 | Lettuce (Romaine) | *E. coli* O157:H7 | 55 | AR, AZ, IL, IN, KS, KY, MN, MO, NE |

3.2    In or about October 2012, in collaboration with the Food and Drug Administration, the New York State Department of Health, the New York State Department of Agriculture and Markets, and The Center for Disease Control and Prevention investigated an outbreak of sixteen (16) *E. coli* O157:H7 infections reported in New York State.  As a consequence of this investigation, Wegman's, a local food retailer, recalled its brand of "Organic Spinach and Spring Mix" sold in 5 oz. and 11 oz. packages from its stores in New York, Pennsylvania, New Jersey, Virginia, Maryland and Massachusetts sold between October 14 and November 1, 2012.  Upon information and belief, Wegman's recalled the product, a blend of organic spinach and spring mix, based on an association between the product and reported illnesses in New York State due to *E. coli* O157:H7 identified by New York State officials.  The product is supplied to Wegman's by defendant State Garden, located in Chelsea, Massachusetts.  At present, it is believed that the outbreak involves at least twenty-eight (28) victims from five (5) states, most cases in New York.

## The Plaintiffs' Injuries

3.3    Erica Duerr is 32 years old.  She gave birth to her second child on October 5, 2012.  Erica Duerr is a registered nurse at DeGraff Memorial Hospital.

3.4    Beth Duerr is 60 years old.  She is plaintiff Erica Duerr's mother-in-law, and she also works at DeGraff Memorial Hospital in the records department.

3.5    On or about October 18, 2012, Beth Duerr purchased Wegman's spinach and spring salad mix at the Wegman's store on Niagara Falls Boulevard in Amherst, New York.

3.6    Erica Duerr and her husband, and their two children, including their newborn baby, visited Beth Duerr's home over the weekend of October 19 and 20, 2012.  On both of these dates, Erica and Beth Duerr, and other members of the Duerr family, ate salads made from the Wegman's spinach and spring salad mix purchased on or about October 18, 2012.

3.7    On or about October 22, 2012, Erica Duerr began to experience gastrointestinal symptoms, including nausea, abdominal cramps, and diarrhea.  The symptoms progressed that night, increasing in frequency and intensity.  By the next day, October 23, 2012, the repeated bouts of diarrhea became grossly bloody, occurring approximately every 20-30 minutes.

3.8    Due to her deteriorating condition, Erica Duerr was unable to care for, nurse, or even touch her newborn baby.  Beth Duerr helped to care for her grandchild during this period, and also assisted in caring for her seriously-ill daughter-in-law Erica.

3.9     On or about October 23, 2012, Erica Duerr's husband drove her to the emergency department at DeGraff Memorial Hospital.  After a CT scan and other treatment, including intravenous fluids for dehydration, she was diagnosed with colitis.  The attending physician indicated to Erica Duerr and her husband that she should be admitted to the hospital.  The Duerrs declined opting instead to return home so that they could be with their newborn baby and four-year-old child.

3.10    Erica Duerr's symptoms only became worse after she was discharged from the emergency department on October 23, 2012.  She was unable to stand due to the severity of her symptoms, and she continued to be too afraid, and too weak, to hold her newborn baby.

3.11    Hours later, the Duerrs reversed their decision and Erica Duerr was driven by her husband back to the emergency department at DeGraff Memorial Hospital that same day, October 23, 2012.  While there, she delivered a stool sample for testing and received additional intravenous fluids to treat the dehydration, as well as Ciprofloxacin, an antibiotic, and an anti-spasmodic medication to help her cope with the extreme abdominal pain.  Erica was discharged the next morning, October 24, 2012, but her extreme symptoms continued thereafter.

3.12    On or about October 27, 2012, Beth Duerr also began to suffer from severe gastrointestinal symptoms.  The symptoms were similar to those that her daughter-in-law had been suffering from since October 22, 2012.  That evening, Beth Duerr's repeated bouts of diarrhea turned bloody.

3.13    The following two days, October 28 and 29, 2012, Beth Duerr remained in bed.   She continued to suffer from bloody diarrhea, severe abdominal cramps, and a host of other gastrointestinal symptoms.   She was unable to eat much at all, and also had a difficult time keeping any liquids down.

3.14    On or about October 29, 2012, Beth Duerr was taken to the emergency department at DeGraff Memorial Hospital for treatment.   She was informed during her stay there that her daughter-in-law Erica Duerr's stool sample had tested positive for *E. coli* O157:H7.

3.15    Erica Duerr had been contacted earlier in the day on October 29, 2012, by an official from the health department, who informed her of the positive *E. coli* O157:H7 test. At this time, Erica Duerr received instruction to discontinue the antibiotic that she had been taking, due to the possibility that her *E. coli* O157:H7 infection could become even worse as a result of antimicrobial treatment.

3.16    Meanwhile at DeGraff Memorial, Beth Duerr received intravenous fluids to correct her severe dehydration.   She did not receive any antibiotics.

3.17    Erica and Beth Duerr experienced a gradual resolution of their symptoms, but those symptoms continued at a lesser intensity for many days following their respective visits to the DeGraff Memorial Hospital's emergency department.

3.18    Beth Duerr, who, like her daughter-in-law Erica, works at DeGraff Memorial Hospital, missed several days of work during her acute illness.   Erica Duerr was on maternity leave at the time of her illness, and therefore did not miss

6

work due to her severe symptoms.   However, for approximately a week, Erica Duerr was unable to care for (*e.g.,* breast feed) her newborn baby.

## CAUSES OF ACTION

### Strict Liability – Count I

4.1    At all times relevant hereto, the defendant was a manufacturer, supplier, packager, distributor and/or seller of the adulterated food product that is the subject of this action.

4.2    The adulterated food product that the defendant manufactured, supplied, packaged, distributed, and/or sold was, at the time it left the defendant's control, defective and unreasonably dangerous for its ordinary and expected use because it contained *E. coli* O157:H7, a deadly pathogen.

4.3    The adulterated food product that the defendant manufactured, supplied, packaged, distributed, and/or sold was delivered to the plaintiffs without any change in its defective condition.   The adulterated food product that the defendant manufactured, supplied, packaged, distributed, and/or sold was used in the manner expected and intended, and was consumed by the plaintiffs.

4.4    The defendant owed a duty of care to the plaintiffs to manufacture, supply, package, distribute and/or sell food that was not adulterated, that was fit for human consumption, that was reasonably safe in construction, and that was free of pathogenic bacteria or other substances injurious to human health.   The defendant breached this duty.

4.5    The defendant owed a duty of care to the plaintiffs to manufacture, supply, package, distribute and/or sell food that was fit for human consumption, and that was safe to the extent contemplated by a reasonable consumer.  The defendant breached this duty.

4.6    Plaintiffs suffered injury and damages as a direct and proximate result of the defective and unreasonably dangerous condition of the adulterated food product that the defendant manufactured, supplied, packaged, distributed and/or sold.

## Breach of Warranty – Count II

4.7    The defendant is liable to the plaintiffs for breaching express and implied warranties that they made regarding the adulterated product that Beth Duerr purchased, and that Erica Duerr and Beth Duerr consumed.  These express and implied warranties included the implied warranties of merchantability and/or fitness for a particular use.   Specifically, the defendant expressly warranted, through its sale of food to the public and by the statements and conduct of its employees and agents, that the food it prepared and sold was fit for human consumption and not otherwise adulterated or injurious to health.

4.8    The *E. coli*-contaminated food that the defendant sold to retailers, which in turn was sold to plaintiff Beth Duerr, would not pass without exception in the trade and was therefore in breach of the implied warranty of merchantability.

4.9    The *E. coli*-contaminated food sold to plaintiff Beth Duerr was not fit for the uses and purposed intended, *i.e.,* human consumption, and that this product was therefore in breach of the implied warranty of fitness for its intended

use.

4.10   As a direct and proximate cause of the defendant's breach of warranties, as set forth above, the plaintiffs sustained injuries and damages in an amount to be determined at trial.

## Negligence – Count III

4.11   The defendant owed to the plaintiffs a duty to use reasonable care in the manufacture, supply, packaging, distribution and sale of its food product, which duty would have prevented or eliminated the risk that the defendant's food products would become contaminated with *E. coli* O157:H7 or any other dangerous pathogen.  The defendant breached this duty.

4.12   The defendant had a duty to comply with all statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of its food product, but failed to do so, and was therefore negligent.  The plaintiffs are among the class of persons designed to be protected by these statutes, laws, regulations, safety codes or provision pertaining to the manufacture, distribution, storage, and sale of similar food products.

4.13   The defendant had a duty to properly supervise, train and monitor its respective employees, and to ensure its respective employees' compliance with all applicable statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of similar food products, but the defendant failed to do so and was therefore negligent.

4.14   The defendant had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, free of defects, and

that otherwise complied with applicable federal, state, and local laws, ordinances, and regulations, and that were clean, free from adulteration, and safe for human consumption, but the defendant failed to do so and was therefore negligent.

4.15    As a direct and proximate result of the defendant's acts and omissions of negligence, the plaintiffs sustained injuries and damages in an amount to be determined at trial.

### Negligence *Per Se* – Count IV

4.16    The defendant had a duty to comply with all applicable state and federal regulations intended to ensure the purity and safety of its food product, including the requirements of the Federal Food, Drug and Cosmetics Act (21 U.S.C. § 301, *et seq.*).

4.17    The defendant failed to comply with the provisions of the health and safety acts identified above, and, as a result, was negligent *per se* in its manufacture, distribution, and sale of food adulterated with *E. coli* O157:H7, a deadly pathogen.

4.18    As a direct and proximate result of conduct by the defendant that was negligent *per se*, the plaintiffs sustained injury and damages in an amount to be determined at trial.

### DAMAGES

5.1    The plaintiffs have suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of the defendant, in an amount that shall be fully proven at the time of trial.  These damages include, but are not limited to:  damages for general pain

and suffering; damages for loss of enjoyment of life, both past and future; medical and related expenses, both past and future; travel and travel-related expenses, past and future; emotional distress, past and future; pharmaceutical expenses, past and future; lost wages; and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## JURY DEMAND

6.1    The plaintiffs hereby demand a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE,** the plaintiffs pray for judgment against the defendant as follows:

A.    Ordering compensation for all general, special, incidental, and consequential damages suffered by the plaintiffs as a result of the defendant's conduct;

B.    Awarding plaintiffs their reasonable attorneys' fees and costs, to the fullest extent allowed by law; and

C.    Granting all such additional and/or further relief as this Court deems just and equitable.

DATED:    December 4, 2012
          Rochester, New York          **MARLER CLARK, LLP, PS**

By:    /s/ William D. Marler
       William D. Marler, Esq., WSBA #17233
       *Attorneys for Plaintiff*
       1301 Second Avenue, Suite #2800
       Seattle, Washington  98101
       Telephone:  1-(866) 770-2032
       bmarler@marlerclark.com

11

UNDERBERG & KESSLER LLP

By:   /s/ Paul V. Nunes
Paul V. Nunes, Esq., NYSBA #1046135
*Attorneys for Plaintiff*
300 Bausch & Lomb Place
Rochester, New York 14604
Telephone:  (585) 258-2800
pnunes@underbergkessler.com